Kelly, C.J.
I concur in full with Justice HATHAWAY and with parts I, II, and 111(A) of Justice Young’s opinion. I write separately to touch on parental indemnity agreements in the context of liability waivers involving children. Justice YOUNG takes the position that a defendant can circumvent the unenforceability of a parental preinjury liability waiver simply by entering into a separate indemnity agreement with the parent. In footnote 74 of his opinion, he states:
I note that, even without a change in the common law rule, defendant has alternatives for reducing its liability. For example, defendant’s waiver in this case suggests a suitable, although perhaps less than optimal, alternative: parental indemnity. A parent can contract on the parent’s own behalf to indemnify the defendant for any losses arising from injuries his child suffers while participating in the activity offered by the defendant.
Justice YOUNG is the only one who has advanced this position and it has not been adopted by this Court. I find his proposition problematic for several reasons.
First, his discussion of the issue is unnecessary to resolve the case. Second, neither of the parties advanced this argument, and this Court did not have a proper opportunity to consider and pass on it. I would be *261 hesitant to make such a sweeping holding without having briefing on the matter. Also, the Court has not given due consideration to how indemnity agreements by parents interact with parental preinjury liability waivers.
Finally, the validity of such indemnity agreements is questionable. They would require an injured child to seek recovery from his or her parent. Courts in a number of states have held that such indemnity agreements are unenforceable because they produce the same effect as parental preinjury liability waivers. That is, they enable a tortfeasor who is negligent to shift financial responsibility for its tortious conduct to the parent of the minor victim. [1]
The validity of such indemnity agreements is not answered in this case and is left for another day.
Cavanagh, J.
I would affirm the Court of Appeals’ decision that defendant was not entitled to summary disposition on the basis of the release. I would do so, however, on different grounds. The actual language of the release at issue did not waive the minor child’s claims. Instead, the release only waived the claims of the “undersigned,” and the undersigned was the child’s father. Although I believe that whether a parental preinjury liability waiver is valid and enforceable is an issue of jurisprudential significance, I find it unnecessary to reach that issue in this case.[1] Accordingly, I *262 would vacate the portion of the judgment of the Court of Appeals that held that preinjury waivers effectuated by parents on behalf of their minor children are not presumptively enforceable, and I would remand the case to the trial court for further proceedings.
Markman, J.
I agree that defendant was not entitled to summary disposition on the grounds that the actual language of the waiver at issue did not waive the minor’s claims. Accordingly, I would affirm the judgment of the Court of Appeals. However, I would vacate the analysis that concluded that a parent cannot waive a child’s negligence claim prospectively in order to participate in voluntary recreational activities. In that regard, the Court of Appeals answered a question that was not properly before it given the actual terms of the release. The lead opinion and those of Justice HATHAWAY and Chief Justice KELLY do the same. Therefore, I disagree with this conclusion of law. If this issue were properly before us — and it is not — I would clarify that Michigan’s common law does allow the enforcement of such a waiver. That is, if the release in this case had actually contained effective language indicating that the father was waiving his son’s negligence claims prospectively, I would conclude that Michigan common law permits the enforcement of that waiver to the same extent as if the father himself had signed a preinjury waiver of his own rights as a condition of participating in a sporting or recreational activity.[1]
*263 I. THE RELEASE
As recognized in the lead opinion, Jeffrey Woodman signed a form so that his son could participate in a recreational activity. The pertinent part of the release, which only the father signed, provided:
THE UNDERSIGNED, by his/her signature herein affixed does acknowledge that any physical activities involve some element of personal risk and that, accordingly, in consideration for the undersigned waiving his/her claim against BOUNCE PARTY, and their agents, the undersigned will be allowed to participate in any of the physical activities.
Thus, the release stated plainly that the “undersigned” (who was the father), in consideration for waiving his claim against defendant, would be allowed to participate in any of defendant’s physical activities, which involved some element of personal risk. While the child was identified as a “participant” at the bottom of the release, the only waiver that actually occurred was by and for the “undersigned,” the father. Thus, the actual language of the release simply did not waive any claims or rights of the minor, whatever was purported to have been done and whatever issues the parties have determined to litigate.
*264 Remarkably, the justices comprising the majority do not see this as a barrier to their opinions. Rather, they decide that if the document had been drafted to state that the father was waiving his son’s potential claims — which again it was not — it would have been unenforceable. This is a noteworthy pronouncement of law, but over the past 175 years or so, this Court has been in the habit of uttering such pronouncements only in response to actual and not hypothetical disputes. We have been in the habit of viewing an actual dispute as a condition for the exercise of our “judicial power.” Const 1963, art 6, § 1. To decide a hypothetical dispute is the equivalent of issuing an advisory opinion, which, with narrow constitutional exceptions, is beyond the scope of this judicial power.[2]
In effect, the justices in the majority assert the invalidity of a contract into which the parties never entered. This constitutes nothing less than reaching out to decide a non-controversy — indeed, in this case, a false controversy. The opinions of the justices in the majority, whatever their substantive merits, constitute little more than nonbinding dicta and more properly belong in a law review rather than a volume of the Michigan Reports.
The lead opinion suggests that plaintiff “abandoned” or “waived” the argument that the release did not actually waive the son’s claims because, although plaintiff preserved this issue in the trial court, he did not preserve it in the Court of Appeals. While I certainly agree that an appellate court will not ordinarily review an issue that has been abandoned or waived, such *265 review is allowed when it is “necessary to a proper determination of the case . . ." Dation v Ford Motor Co, 314 Mich 152, 160-161; 22 NW2d 252 (1946); see also Paramount Pictures Corp v Miskinis, 418 Mich 708, 731; 344 NW2d 788 (1984); Prudential Ins Co of America v Cusick, 369 Mich 269, 290; 120 NW2d 1 (1963).[3] This could not be more clearly the situation here. The individual decision of a litigant not to pursue an available argument, or to relinquish an available issue, cannot impose on this Court an obligation to operate upon a false premise, in this case that a contract says what it clearly does not say. [4] That is, neither an individual litigant nor even both litigants acting jointly can require this Court to turn a blind eye toward the actual words of a dispositive document. No matter what the parties’ determination to have a particular issue decided, they cannot impose on this Court the obligation to pretend that A does not say A; no litigant can obligate this Court to ignore what is true and accept what is false.
Thus, in deciding whether a parent can waive a child’s claims before the injury, the justices in the *266 majority are compelled to rewrite what is a straightforward release. However, the proper rule is that the scope of a release is controlled by its language, and we construe such language as written. See Batshon v Mar-Que Gen Contractors, Inc, 463 Mich 646, 649-650; 624 NW2d 903 (2001); McDonald v Farm Bureau Ins Co, 480 Mich 191, 197-198; 747 NW2d 811 (2008). The justices in the majority construe the release not “as written,” but as rewritten.
For these reasons, I would affirm the judgment of the Court of Appeals that held that defendant was not entitled to summary disposition, but I would vacate the Court of Appeals’ analysis addressing a parent’s ability to waive a child’s negligence claims prospectively. I thus dissent from the decision to rewrite a contract in order to answer a question not raised by the actual contract.
II. THE COMMON LAW
A. NATURE OF THE COMMON LAW
The common law originated in the decisions of English judges, starting in the early Middle Ages, and developed over the ensuing centuries. Hall, ed, The Oxford Companion to American Law, (New York: Oxford University Press, 2002), p 125. Sir Edward Coke explained that the common law was the “custom of the realm.” Coke, The Complete Copyholder, p 70 (1641). He indicated that if a custom was “current throughout the commonwealth,” it was a part of the common law. Id. Sir William Blackstone similarly discussed “[general customs; which are the universal rule of the whole kingdom, and form the common law.” 1 Blackstone, Commentaries on the Laws of England, p 67.
The “common law and its institutions were systemically extended to America, at least insofar as appropri *267 ate for frontier conditions.” Oxford Companion, p 127. This was true in particular in Michigan where each of its constitutions (starting in 1835) generally adopted the common law.[5] Given that the common law develops through judicial decisions, it has been described as “judge-made law.” Placek v Sterling Hts, 405 Mich 638, 657; 275 NW2d 511 (1979). As this Court explained in Bugbee v Fowle, the common law “ ‘is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes.’ ” Bugbee v Fowle, 277 Mich 485, 492; 269 NW 570 (1936), quoting Kansas v Colorado, 206 US 46, 97; 27 S Ct 655; 51 L Ed 956 (1907).
The common law, however, is not static. By its nature, it adapts to changing circumstances. See Oliver Wendell Holmes, Jr., The Common Law (New York: Dover Publications, Inc., 1991), p 1 (noting that the common law is affected by “the felt necessities of the time, the prevalent moral and political theories, [and] intuitions of public policy” and that it “embodies the story of a nation’s development through many centuries”). And as this Court stated in Beech Grove Investment Co v Civil Rights Comm:
It is generally agreed that two of the most significant features of the common law are: (1) its capacity for growth and (2) its capacity to reflect the public polity of a given era.
*268 “The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law, but it is a flexible body of principles which are designed to meet, and are susceptible of adaption to, among other things, new institutions, public policies, conditions, usages and practices, and changes in mores, trade, commerce, inventions, and increasing knowledge, as the progress of society may require. So, changing conditions may give rise to new rights under the law . . . .” [Beech Grove Investment Co v Civil Rights Comm, 380 Mich 405, 429-430; 157 NW2d 213 (1968), quoting CJS, Common Law, § 2, pp 43-44.]
The common law is always a work in progress and typically develops incrementally, i.e., gradually evolving as individual disputes are decided and existing common-law rules are considered and sometimes adapted to current needs in light of changing times and circumstances. In re Arbitration Between Allstate Ins Co & Stolarz, 81 NY2d 219, 226; 597 NYS2d 904; 613 NE2d 936 (1993) (noting that the law evolves through the “incremental process of common-law adjudication as a response to the facts presented”);[6] see also People v Aaron, 409 Mich 672, 727; 299 NW2d 304 (1980) (“Abrogation of the felony-murder rule is not a drastic move in light of the significant restrictions this Court has already imposed. Further, it is a logical extension of our decisions ....”).
*269 b. common-law authority
The lead opinion acknowledges that this Court “unquestionably” has the authority to modify the common law.[7] Ante at 231. This authority is traceable to Const 1963, art 3, § 7, which provides:
The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.
As stated in Myers v Genesee Co Auditor, 375 Mich 1, 7; 133 NW2d 190 (1965) (opinion by O’HARA, J.): “ ‘Amendment’ and ‘repeal’ refer to the legislative process. ‘Change’ must necessarily contemplate judicial change. The common law is not static, fixed and immutable as of some given date.” Thus, the ability to alter the common law is constitutionally vested in both the Legislature and the judiciary. There is no violation of separation-of-powers principles under Const 1963, art 3, § 2, when the judiciary alters the common law because that power is given to both branches to exercise through means and procedures that are proper to each.[8] *270 The common law is, thus, law subject to continuing judicial and legislative development.[9]
The lead opinion contends that this Court is less well positioned than the Legislature to decide whether the common law should be altered.[10] Although there may well be instances in which this is true, and in which prudence would dictate that we defer to the Legislature, *271 I do not know why this should invariably be true.[11] The common law of parental waivers has been a matter of longstanding judicial interest in this state, the legal rights of children is an issue well known to this Court in a wide variety of contexts, the judiciaries of most other states have addressed the common law of parental waivers, and the immediate dispute involves only whether to clarify, or ‘fine-tune’ at the margins, a common-law rule of considerable vintage. Each of these factors implicates exactly the kind of decision-making that typifies the evolution of the common law. Our constitution gives the judiciary the authority to change the common law because the common law is “judge-made law.” Placek, 405 Mich at 657. And it is well recognized that rules that were “judge-invented” can be “judge-reinvented,” “judge-uninvented,” or, as I believe is required in this case, “judge-clarified.” See Montgomery v Stephan, 359 Mich 33, 49; 101 NW2d (1960). As *272 was stated in Moning v Alfono, 400 Mich 425, 436; 254 NW2d 759 (1977): “The law of negligence was created by common-law judges and, therefore, it is unavoidably the Court’s responsibility to continue to develop or limit the development of that body of law absent legislative directive.”
I would further observe that in Henry v Dow Chern Co, 473 Mich 63, 83; 701 NW2d 684 (2004), which the lead opinion cites, this Court explained that it is “the principal steward of Michigan’s common law.”[12] (Emphasis added.) And in Burns v Van Laan, 367 Mich 485, 494; 116 NW2d 873 (1962), we stated, “In that great field where the common law grows or withers the judiciary is the primary actor.” (Emphasis added.)[13] *273 Then, in Placek, 405 Mich at 657, 659, we reiterated that this Court may alter the common law through its decisions: “[W]hen dealing with judge-made law, this Court in the past has not disregarded its corrective *274 responsibility in the proper case. . . . [The courts] are certainly in as good, if not better, a position to evaluate the need for change, and to fashion that change.” In People v Stevenson, 416 Mich 383, 390; 331 NW2d 143 (1982), we stated, “This Court has often recognized its authority, indeed its duty, to change the common law when change is required.” And in Adkins v Thomas Solvent Co, 440 Mich 293, 317; 487 NW2d 715 (1992), we asserted: “When appropriate, we have not hesitated to examine common-law doctrines in view of changes in society’s mores, institutions, and problems, and to alter those doctrines where necessary.”
For these reasons, I reject the Court of Appeals’ statement that “we can neither judicially assume nor construct exceptions to the common law extending or granting the authority to parents to bind their children to exculpatory agreements. Thus, the designation or imposition of any waiver exceptions is solely within the purview of the Legislature.” Woodman v Kera, LLC, 280 Mich App 125, 149; 760 NW2d 641 (2008) (opinion by TALBOT, J.). Far more accurately, as Judge BANDSTRA stated, the issue is for “either the Michigan Legislature or our Supreme Court ....” Id. at 157 (BANDSTRA, J., concurring) (emphasis added).
C. COMMON-LAW PRINCIPLES
The lead opinion correctly states that when deciding whether to clarify or change the common law, this Court should consider existing sources of public policy, such as statutes and other court decisions setting forth common-law doctrines.[14] As a starting point, we inquire *275 whether the Legislature has already spoken regarding the specific issue.[15] If not, we then inquire whether the Legislature has preempted a particular area of the law.[16] When we determine that the Legislature has not specifically spoken, and has not preempted the adoption or *276 revision of a new common-law rule, we consider whether a clarification or change of the common law is warranted in light of a variety of factors discussed herein.
As noted, “we have not hesitated to examine common-law doctrines in view of changes in society’s mores, institutions, and problems, and to alter those doctrines where necessary.” Adkins, 440 Mich at 317. But as counseled in People v Kevorkian, 447 Mich 436, 482 n 60; 527 NW2d 714 (1994) (opinion by CAVANAGH, C.J., and BRICKLEY and GRIFFIN, JJ.), citing Judge Cardozo’s The Nature of the Judicial Process:
The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to the primordial necessity of order in the social life. Wide enough in all conscience is the field of. discretion that remains. [Quotation marks and citations omitted.[17]
It is also the case that “endeavoring to uncover the doctrinal underpinnings of common-law rules can be an effective — if not essential — way of determining whether a suggested [clarification or] change [to a common-law rule] is warranted.” Young, A judicial traditionalist confronts the common law, 8 Texas Rev L & Pol 299,309 (2004); see also Montgomery, 359 Mich at 49 (“The reasons for the old rule no longer obtaining, the rule *277 falls with it.”);[18] James v Alberts, 464 Mich 12, 17; 626 NW2d 158 (2001) (abolishing the volunteer doctrine because “the fellow-servant rule, which created the need for the volunteer doctrine, was no longer part of our law”). Thus, when the common-law rationale for a particular rule has dissipated, the rule itself may be subject to revision or change.
Courts also consider other relevant, though not directly applicable, statutes in determining whether to clarify or change the common law because
“legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law.” [Moning, 400 Mich at 453-454, quoting Moragne v States Marine Lines, Inc, 398 US 375, 390-391; 90 S Ct 1772; 26 L Ed 2d 339 (1970).]
Thus, we also look to (1) actual social customs and practices, and changes in such customs and practices, (2) the doctrinal underpinnings of a common-law rule and their continuing relevance, (3) related statutes and *278 case-law, and (4) the extent to which existing rules may reasonably be supposed to have influenced or determined the conduct of the litigants. But in the final analysis, we ask ourselves, what common-law rule would best serve the interests of Michigan citizens while taking into consideration the prevailing customs and practices of the people?[19]
III. PARENTAL PREINJURY WAIVERS
The justices in the majority assert that under existing Michigan common law, a preinjury release signed by a parent waiving a child’s negligence claim in order to enable that child to participate in a sporting or recreational activity is unenforceable. However, they do not cite a single Michigan case holding that a preinjury parental waiver is unenforceable.[20] Instead, they only *279 cite cases involving parental waivers of existing claims. Until today, Michigan’s common-law rule against parental waivers has only been applied to the latter claims. I would not, as do the justices comprising the majority, extend our common-law rule against postinjury parental waivers to preinjury parental waivers. These waivers are very different.
The trial court held that the preinjury waiver here was enforceable, specifically noting the absence of “any Michigan case which says that a parent who signs a waiver like this one prior to a child engaging in an activity is engaging in an act which is a legal nullity.” Similarly, Judge BANDSTRA correctly stated, “There is no Michigan precedent explicitly discussing whether the postinjury rule against parental waivers should apply in a preinjury case.” Woodman, 280 Mich App at 157 (BANDSTRA, P.J., concurring). And Judge SCHUETTE also correctly remarked upon “the dearth of preinjury, parental-waiver-of-liability caées in Michigan . ...” Id. at 163 (SCHUETTE, J., concurring).
If the justices who make up the majority are correct that current Michigan common law precludes the enforcement of preinjury parental waivers, then the lack of any earlier decision actually stating this proposition is, to say the least, noteworthy, especially given that such waivers have been commonplace in this state and our country for decades. The lead opinion rightly states, “The underlying facts are simple and likely familiar to many parents with young children.” Ante at 233 (emphasis added). Doubtless, the facts are “likely familiar” precisely because generations of parents have routinely *280 been confronted with such waivers as a condition to their children’s participation in sporting and recreational activities. As Judge SCHUETTE observed: “[A]n immense amount of youth activities — church groups, Boy Scouts, sports camps of all kinds, orchestra and theatrical events, and countless school functions — run and operate on release and waiver-of-liability forms for minor children.” Id. at 163-164 (SCHUETTE, J., concurring). In view, therefore, of the facts that (1) preinjury parental waivers have been ubiquitous in this state for decades, enabling children to participate in a wide array of sporting and recreational activities that might otherwise not be available, and (2) there is no Michigan case that has ever held that a parental preinjury waiver is unenforceable, or otherwise prohibited or contrary to public policy, what exactly is the basis for the confident assertion by a majority of justices that such waivers are unenforceable in this state?
The lead opinion correctly observes that in McKinstry v Valley Obstetrics-Gynecology Clinic, PC, 428 Mich 167, 192-193; 405 NW2d 88 (1987), this Court set forth “the common-law rule that a parent has no authority to waive, release, or compromise claims by or against a child.” This statement, however, was made in the course of an opinion that held that a particular statute created an exception to this common-law rule, and the cases cited in McKinstry in support of this rule all involved existing claims. McKinstry did not assert that the common-law rule applies to preinjury parental waivers, and it did not hold that such waivers are unenforceable. To make the point as clearly as possible, until the instant Court of Appeals decision, no existing Michigan case had held that the rule barring parental waivers applied in the preinjury context, and none had applied the rule in such a context, notwithstanding the familiarity of such waivers in this state. Thus, the *281 precise question before this Court is genuinely an issue of first impression in this state.
rv APPLICATION OF THE COMMON-LAW
On the basis of the following considerations, I believe that the common law in our state should be clarified to hold that parental preinjury waivers are enforceable: (1) statutes and caselaw that have enhanced the legal autonomy of minors, (2) statutes and caselaw that have recognized parents’ authority to undertake important decisions regarding their children, (3) decisions of the United States Supreme Court that have ‘constitutionalized’ the rights of fit parents to undertake important decisions regarding their children, (4) statutes and caselaw that have granted protections to recreational providers, (5) freedom of contract principles, (6) evolution of the litigative environment in recent decades, and (7) persuasive decisions from other jurisdictions.
A. AUTHORITY OF MINORS
The lead opinion acknowledges six statutory exceptions to the rule that a minor lacks the capacity to contract. Ante at 237 n 14. Despite this list, however, the justices in the majority give no apparent weight to these exceptions. In reality, there are a far greater number of statutory exceptions to the two common-law rules that form the basis of the decision here, namely that (1) a child cannot bind himself or herself by contract and (2) a parent cannot bind a child by contract.
Concerning the common-law rule that a child cannot bind himself or herself by contract, the lead opinion acknowledges the common-law exception that a child *282 can do so by a contract for necessaries.[21] It also notes a statutory exception, MCL 600.1403, that provides that an infancy defense will not be recognized for breach of contract if a minor willfully misrepresented his or her age when entering into a contract. Under the common law, a child was not considered an adult until age 21, but our Legislature reduced this age to 18 in 1971,[22] and for criminal matters, the effective age of majority is now 17.[23]
*283 The common-law rule that a child is incompetent to enter into a contract has other exceptions. As a result of legislation,[24] minors can now enter into enforceable contracts in these additional situations: (1) upon being emancipated by the family division of circuit court,[25] (2) upon getting married,[26] (3) upon entering into active duty with the United States military,[27] (4) in order to open a savings account,[28] (5) in order to receive substance abuse treatment,[29] (6) in order to receive treatment for a venereal disease or HIY[30] (7) in order to *284 receive pregnancy-related services,[31] (8) in order to receive mental health services,[32] and (9) in order to purchase certain insurance policies.[33] All but one of these statutory exceptions were adopted between 1956 and 1980.
Thus, there is a clear trend in Michigan public policy toward giving increased weight to the significant life decisions of minors by allowing them a limited measure of legal autonomy and responsibility. Indeed, minors are also considered competent to waive a variety of rights when charged with a crime. See, e.g., People v Simpson, 35 Mich App 1; 192 NW2d 118 (1971), which indicates that minors are competent to waive even constitutional rights when charged with a crime.[34]
*285 The common-law rule that minors are incompetent to enter into contracts was predicated on the idea that minors must be protected from their own contractual follies and exploitation by adults. Holmes v Rice, 45 Mich 142; 7 NW 772 (1881); Frye v Yasi, 327 Mass 724, 728; 101 NE2d 128 (1951). These purposes comport with common sense and experience, but neither would be undermined by permitting a child’s parents to exercise their own prudence and judgment on behalf of their minor children in prospectively waiving negligence claims in order to allow their children to participate in recreational activities. As explained in Parham v J R, 442 US 584, 602; 99 S Ct 2493; 61 L Ed 2d 101 (1979), there is a presumption that parents possess what a child lacks in maturity, experience, and the capacity for judgment required for making life’s difficult decisions. Thus, it is not incompatible with the common-law rule concerning the limited ability of a minor to enter into legal contracts to allow the parent the right to permit or deny a child’s participation in sporting or recreational activities and to weigh the risks and benefits of that participation.
B. PARENTAL AUTHORITY
Concerning the common-law rule that a parent cannot bind a child by contract, the courts and the Legislature have found it increasingly appropriate to allow parents to provide consent to their children’s participation in numerous significant activities. As explained in Parham, 442 US at 602:
*286 Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.. .. The law’s concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life’s difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.
More recently, the United States Supreme Court has determined that the right of a parent to decide how a child will be raised is one of the oldest and most fundamental rights emanating from the “liberty” interest of the Due Process Clause of the Fourteenth Amendment. Troxel v Granville, 530 US 57, 65; 120 S Ct 2054; 147 L Ed 2d 49 (2000) (opinion by O’Connor, J.). In Troxel, a plurality cited the Court’s long history of recognizing that the family is a unit within which parents possess “ ‘broad . . . authority over minor children.’ ”[35] Troxel, 530 US at 66, quoting Parham, 442 US at 602. Troxel also indicated that courts may not overturn decisions by a fit custodial parent “solely on [the basis of] the judge’s determination of the child’s best interests.” Troxel, 530 US at 67. Rather, courts must give some “special weight” to the parents’ determination of their children’s best interests. Id. Indeed, in Hunter v Hunter, 484 Mich 247, 258 n 16, 262; 771 NW2d 694 (2009), this Court recognized that Troxel “included forceful language describing the significance of parents’ fundamental liberty interest in the care, custody, and control of their children” before proceeding to hold that “Troxel established a floor or minimum protection against state intrusion into the parenting *287 decisions of fit parents.” Considering the breadth and significance of the constitutional right of a fit parent to raise a child as that parent deems appropriate, I would clarify that parental preinjury waivers are enforceable, in part on the basis of this constitutional development.
There is also Michigan caselaw indicating that parents can consent to a variety of actions having serious consequences for their children. In re Rosebush, 195 Mich App 675, 682-683; 491 NW2d 633 (1992), for example, held that parents are empowered to make decisions regarding withdrawal or withholding of lifesaving or life-prolonging measures on behalf of their children because the right of the parent to speak for the minor child is embedded within our common law. To put it starkly, then, although the common law allows a parent to unilaterally deny or withdraw even life-prolonging medical care for his or her child if the child is seriously injured while participating in a recreational or sporting activity, a majority of justices would deny the same parent the right to prospectively waive a negligence claim that would allow the same child to participate in a ‘Bounce Party,’ or some other sporting or recreational activity, in the first place. And in People v Goforth, 222 Mich App 306; 564 NW2d 526 (1997), the Court of Appeals held that parents may consent to a police search of their child’s bedroom even though such consent could have serious consequences if contraband or other evidence of criminal activity were found in the minor’s room. Moreover, in People v Givans, 227 Mich App 113, 116, 123-124; 575 NW2d 84 (1997), the Court of Appeals affirmed the defendant’s conviction in a case in which the parent consented to have her child interrogated by the police out of her presence— even though the questioning produced a confession to the crime.
*288 In the face of the broad authority parents have regarding the raising of their children, our Legislature has enacted a long list of statutes related to that authority. For example, as a result of legislation, parents can (1) consent to allow their minor daughter obtain an abortion,[36] (2) consent to their minor child’s release of his or her child for adoption,[37] (3) consent to their minor child’s receiving a tattoo, brand, or body piercing,[38] (4) consent to their minor child’s petition for a name change,[39] (5) consent to their minor child’s participation in an undercover operation by purchasing or receiving alcoholic liquor under the supervision of a law enforcement agency,[40] (6) consent to their 16- or 17-year-old child’s marriage,[41] (7) file a petition for court approval of a kidney donation by their minor child to a close relative if the child is at least 14 years old,[42] (8) consent to electroconvulsive therapy or a procedure intended to produce convulsions or a coma for their minor child,[43] (9) consent to the issuance of a level 1 graduated driver’s license to their minor child if the child is 14 years and 9 months old or older,[44] (10) consent to their minor child’s employment as a golf caddy or as a youth athletic program referee or umpire if the child is at least 11 years old,[45] (11) delegate to another person for up to six months most of the *289 parent’s powers regarding care, custody, or property of the minor child by signing a power of attorney,[46] (12) consent to a pawnbroker’s purchase of an item from their minor child,[47] (13) consent to allow a merchant to furnish or sell their minor child bulk gunpowder, dynamite, blasting caps, or nitroglycerine,[48] and (14) consent to the sale of a motor vehicle to their minor child.[49] Similarly, as a result of federal legislation, parents can (15) consent to their 17-year-old child’s enlisting in the United States military[50] and (16) consent to their minor child’s participation as a subject in certain kinds of medical research.[51] Third parties cannot consent to have someone else’s child do or receive these things; only the child’s parents can provide such consent. This is because, contrary to the assertion of the lead opinion, a parent is not merely tantamount to a “third party” with regard to his or her child. There is a clear trend in Michigan public policy toward according parents authority to consent to let their children engage in, or experience, a variety of significant activities. These consent statutes recognize the liberty interest of parents to make important decisions that affect the well-being of their children and acknowledge the constitutional principle that fit parents are presumed to act in the best interests of their children in making those decisions.
As these examples illustrate, current Michigan public policy — genuine public policy rooted in the statutory and decisional law of this state — fully recognizes that *290 parents may make important, even life-altering, decisions on behalf of their children. While the lead opinion cites statutes and common-law doctrines showing the law’s general solicitude toward minors[52] — and who could disagree with such a proposition? — the statutes and cases cited here are in no way inconsistent with those cited by the lead opinion and are fully compatible with a clarification of our common law allowing parents to sign preinjury waivers of negligence claims so their children can participate in recreational and sporting opportunities.[53] Such clarification would be consistent with, and no more than a logical extension of, existing Michigan public policy based on the trends identified in this section.
*291 c. recreational activities
The Legislature has also determined that there is a place in society for recreational activities that occasionally produce injuries by enacting standards of care that preclude claims for injuries to participants, regardless of the injured person’s age, resulting from the inherent risks of such activities. As this Court indicated in Neal v Wilkes, 470 Mich 661; 685 NW2d 648 (2004), the Legislature enacted Michigan’s recreational land use statute, MCL 324.73301, to provide immunity for landowners from personal-injury lawsuits by persons using their property recreationally, regardless of age, i.e., even when minors are injured.[54] As we discussed in Anderson v Pine Knob Ski Resort, Inc, 469 Mich 20; 664 NW2d 756 (2003), the Legislature enacted Michigan’s Ski Area Safety Act, MCL 408.321 et seq., to provide immunity for ski-area operators from personal-injury suits by injured skiers, regardless of the age of the skier.[55] And *292 as was further mentioned in Dale v Beta-C, Inc, 227 Mich App 57; 574 NW2d 697 (1997), the Legislature enacted Michigan’s Roller Skating Safety Act, MCL 445.1721 et seq., to provide some immunity for rollerskating rink operators from personal-injury suits by injured skaters, again regardless of the skater’s age.[56] See also the Equine Activity Liability Act (EALA), MCL 691.1661 et seq., which proscribes general claims for ordinary negligence, regardless of the injured person’s age. In particular, the EALA proscribes liability for injuries resulting from the inherent risks of equine activity.[57] We should give significant weight to the Legislature’s expression of the public policy that such activitie's are worthy of protection, even in light of their risks, and that providers of such activities are entitled to receive some measure of protection from lawsuits in the absence of gross negligence, even when the participants are minors.
Similarly, our state’s caselaw evidences that Michigan public policy recognizes that there are benefits to recreational activity. In Benejam v Detroit Tigers, Inc, 246 Mich App 645, 657-658; 635 NW2d 219 (2001), in which a minor was injured by a flying bat fragment, the *293 Court of Appeals reversed a jury verdict and dismissed the injured minor’s claim after adopting the “limited duty doctrine” as a matter of Michigan law.[58] See also Moning, 400 Mich at 458, in which this Court said:
[B]aseball equipment and bicycles ... are viewed by society essentially as are automobiles in that although children are injured and killed riding bicycles and playing baseball, the utility of such activity is regarded by society and all reasonable persons as outweighing the risk of harm created by their manufacture for and marketing to children.
Indeed, in Ritchie-Gamester v City of Berkley, 461 Mich at 73, 92 n 13; 597 NW2d 517 (1999), this Court described recreational activities as “valuable” and “important” “social activities.” We should take cognizance of and give weight to these judicial decisions when assessing whether there is a public policy favoring parental preinjury waivers as a condition to allowing minors to participate in sporting and recreational activities and how this ought to be reflected in our state’s common law.
D. FREEDOM OF CONTRACT
The common-law default position is that contracts are enforced. Terrien v Zwit, 467 Mich 56, 71; 648 NW2d 602 (2002).[59] This freedom of contract is “deeply *294 entrenched in the common law of Michigan.” Id. at 71 n 19. The lead opinion, however, states that the issue is “whether a minor can be bound by a contract signed on his behalf by a third party.” Ante at 238. I respectfully disagree with how the lead opinion frames this issue.[60] It errs in characterizing a parent as a “third party” with respect to his or her own child. The better, and more precisely, crafted question is whether a parent — a person who in the course of caring for his or her child might take actions pertaining to such matters as the location and establishment of a home, schooling, health care, diet and nutrition, discipline, social and family relationships, lifestyle, hobbies, clothing, religion, instruction in values, vacations, and, yes, even recreational activities, to name a few — may prospectively waive the child’s future negligence claim so that the child can participate in a sporting or recreational activity. That is, the relevant question in this case pertains to the rights of a “parent,” not those of a “third-party.”
The common-law rule that parents are empowered to make important decisions regarding their children was recognized in In re Rosebush, 195 Mich App at 682-683. See also In re LHR, 253 Ga 439, 445; 321 SE2d 716 (1984) (“The right of the parent to speak for the minor child is. . . imbedded in our tradition and common law....”). Moreover, as previously indicated, caselaw holds that parents are presumed to act in the best interests of their children and are entitled to make *295 judgments and decisions concerning risks to their children. Parham, 442 US at 602. The lead opinion discounts this presumption as overbroad, noting that it is not limited to preinjury waivers and could be cited to justify a parent being able to bind a child to any contract. Ante at 250.1 agree this presumption does not justify allowing a parent to enter into any contract that would be binding on a child. But this presumption, now of constitutional dimension, does support making parental preinjury waivers of negligence claims enforceable.
Assuming that the release actually waived the child’s claim in this case, a parent made the decision that the benefits to his child flowing from the waiver outweighed the risks of a broken leg, as was suffered here, or an even more serious injury. Although plaintiff now seeks to avoid his obligations under the waiver on the grounds that it is “unenforceable,” the father’s waiver was nonetheless entered into voluntarily and knowingly. This Court should not disturb that decision, out of regard for the parent’s rights to undertake such decisions for the child, as well as out of regard for traditional ‘freedom of contract’ principles. A majority of the justices forbid parents under all circumstances to undertake even a perfectly rational decision to assess the risks and benefits when determining what is in the best interests of their children. Instead, such decision-making will now be monopolized by judges, and the answer will always be the same: “No. The parent cannot be permitted to make such a determination.” That is, no matter how compelling the child’s interest in participating in a sporting or recreational activity, and no matter how slight the risk of a serious injury, the answer will always remain the same. There can be no parental preinjury waiver; there can be no assessment of the risks and benefits by the person who is constitu *296 tionally presumed to be, and who in reality is, more concerned than anyone else in the world about the well-being of that child; and there can be no contract freely entered into by adults, both of whom may be exercising entirely reasonable and sound judgments.
The justices in the majority refuse to enforce the preinjury waiver contract, noting that postinjury waivers are not enforced. But I would not extend our common-law rule against postinjury parental waivers to preinjury parental waivers. These situations are quite different. As Judge BANDSTRA stated in his concurrence in the Court of Appeals:
“ ‘The concerns underlying the judiciary’s reluctance to allow parents to dispose of a child’s existing claim do not arise in the situation where a parent waives a child’s future claim. A parent dealing with an existing claim is simultaneously coping with an injured child; such a situation creates a potential for parental action contrary to that child’s ultimate best interests.
“ ‘A parent who signs a release before her child participates in a recreational activity, however, faces an entirely different situation. First, such a parent has no financial motivation to sign the release. To the contrary, because a parent must pay for medical care, she risks her financial interests by signing away the right to recover damages. Thus, the parent would better serve her financial interests by refusing to sign the release.
“ ‘A parent who dishonestly or maliciously signs a preinjury release in deliberate derogation of his child’s best interests also seems unlikely. Presumably parents sign future releases to enable their children to participate in activities that the parents and children believe will be fun or educational. Common sense suggests that while a parent might misjudge or act carelessly in signing a release, he would have no reason to sign with malice aforethought.
“ ‘Moreover, parents are less vulnerable to coercion and fraud in a preinjury setting. A parent who contemplates *297 signing a release as a prerequisite to her child’s participation in some activity faces none of the emotional trauma and financial pressures that may arise with an existing claim. That parent has time to examine the release, consider its terms, and explore possible alternatives. A parent signing a future release is thus more able to reasonably assess the possible consequences of waiving the right to sue.’ ” [Woodman, 280 Mich App at 158-159 (BANDSTRA, P.J., concurring) (citations omitted).]
I agree with Judge BANDSTRA’s observations and have no difficulty concluding that the policy considerations underlying the rule limiting postinjury waivers absent judicial approval are sharply distinct from those at issue with respect to the preinjury rule. In particular, the traditional freedom of contract enjoyed by parents with regard to their children argues in favor of allowing enforcement of parental preinjury waivers.
E. GROWTH OF LITIGATION
There can also be little denying Judge BANDSTRA’s observation that “[a]s this case amply demonstrates, ours is an extremely and increasingly litigious society.”[61] Id. at 160. “Children have routinely jumped off *298 playground slides for generations; lawsuits seeking to impose damages on someone else for resulting injuries are only a recent phenomenon.” Id. at 160 n 2. As a result of trends toward increasing litigation in modern society, 48 jurisdictions adopted tort reform legislation between 1985 and 1988. Sanders & Joyce, Off to the races: The 1980s tort crisis and the law reform process, 27 Hous L R 207, 220-222 (1990). Even in 1992 it was stated:
New would dispute the proposition that America has become a litigious society and that the preferred method for resolving disputes and achieving social reform is to file lawsuits. In 1989, close to eighteen million new civil cases were filed in state and federal courts, amounting to one lawsuit for every ten adults. In the federal courts alone, the number of lawsuits filed each year has more than quadrupled in the last thirty years — from approximately 51,000 in 1960 to almost 218,000 in 1990. [Quayle, Civil justice reform, 41 Am U L R 559, 560 (1992).][62]
Indeed, this Court has previously expressed “concern over the effect of increased litigation on recreational activities” and identified “clear evidence that litigation can exact a toll on what most would consider valuable social activities.” Ritchie-Gamester, 461 Mich at 92 n *299 13. I agree with Ritchie-Gamester that “our duty” is to adopt common-law rules that do not create “destructive levels of litigation that will inhibit important social activity.” Id. at 93 n 13.[63] Unfortunately, the concern expressed in Ritchie-Gamester is not shared by a majority of justices here. Indeed, their decision to expressly preclude the enforceability of parental preinjury waivers should be seen for what it is: an anti-tort-reform measure that will exact a heavy toll upon valuable social activities. Their decision will encourage the kind of modern litigation that has led to the closing of playgrounds for fear of a child being injured and a lawsuit being filed. See, e.g., Messina v Dist of Columbia, 663 A2d 535, 538 (DC, 1995) (holding that expert testimony was necessary to establish the standard of care for installation of cushioning under the monkey bars on a playground).[64]
*300 The more litigious our society becomes, the more each injured child becomes a potential plaintiff in a lawsuit and the more sports and recreational providers see the need to obtain waivers in order to avoid lawsuits and remain in business. Thus, I believe that our society’s overall increase in litigiousness over recent generations constitutes a substantial change in society’s customary practice that supplies an additional reason for this Court to clarify that our common law allows for the enforceability of parental preinjury waivers. A society in which monkey bars and other traditional playground equipment disappear, and in which sports such as dodge ball attract the scrutiny of the bench and bar, may be a society in which there is less risk of injury, but it is also a society in which the nature of childhood, and the responsibilities of parenthood, are defined very differently than they have by past generations of Americans. Because I see no evidence that community views have altered in this regard, I would maintain the genuine common law in this state — one in which parental preinjury waivers are an ordinary part of the family experience — not the distorted common law articulated by a majority here.
E OTHER JURISDICTIONS
The question whether to enforce parental preinjury waivers of negligence claims so that minors may participate in elective recreational activities has arisen in other states.[65] Numerous out-of-state cases have de *301 cided that parental preinjury waivers should be enforced in a wide variety of situations, notwithstanding the common law’s obvious solicitude toward children. It is generally seen as being entirely compatible with that solicitude that parents be allowed to undertake certain decisions on behalf of their children, the consequences of which may not be entirely foreseeable. Who normally would be more concerned about, caring toward, and solicitous of the interests of a child than that child’s parents? In Hohe v San Diego Unified School Dist, 224 Cal App 3d 1559; 274 Cal Rptr 647 (1990), a 15-year-old girl was injured when she volunteered to participate in a hypnotism show sponsored by her school’s parent-teacher-student association. Although the minor and her father had signed a waiver form as a condition to her participation in the show, the plaintiff still attempted to hold the school, the association, and the school district liable for her injuries. The appellate court ruled that the release was not void as against public policy.[66]
In Zivich v Mentor Soccer Club, Inc, 82 Ohio St 3d 367; 696 NE2d 201 (1998), Pamela Zivich registered her seven-year-old son for soccer. The soccer club required Mrs. Zivich to sign a release form for her son as a part *302 of the registration process. The child was injured at practice, and his parents filed a lawsuit. The court held that a parent can bind a minor child to an exculpatory agreement in favor of volunteers and sponsors of nonprofit sport activities when the cause of action sounds in negligence. The court concluded that no public policy was violated by enforcing the release, stating:
It cannot be disputed that volunteers in community-recreational activities serve an important function. Organized recreational activities offer children the opportunity to learn valuable life skills. It is here that many children learn how to work as a team and how to operate within an organizational structure. Children also are given the chance to exercise and develop coordination skills. Due in great part to the assistance of volunteers, nonprofit organizations are able to offer these activities at minimal cost.. ..
[Although Bryan, like many children before him, gave up his right to sue for the negligent acts of others, the public as a whole received the benefit of these exculpatory agreements. Because of this agreement, the Club was able to offer affordable recreation and to continue to do so without the risks and overwhelming costs of litigation. Bryan’s parents agreed to shoulder the risk. Public policy does not forbid such an agreement. In fact, public policy supports it. See Hohe v. San Diego Unified School Dist. (1990), 224 Cal.App.3d 1559, 1564, 274 Cal.Rptr.647, 649. Accordingly, we believe that public policy justifies giving parents authority to enter into these types of binding agreements on behalf of their minor children. We also believe that the enforcement of these agreements may well promote more active involvement by participants and their families, which, in turn, promotes the overall quality and safety of these activities....
*303 [W]e hold that parents have the authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence. These agreements may not be disaffirmed by the child on whose behalf they were executed. [Id. at 371-374.]
In Sharon v City of Newton, 437 Mass 99; 769 NE2d 738 (2002), the Court upheld a release relating to a voluntary high school cheerleading program on the basis of public policy. The Court stated:
In the instant case, Merav’s father signed the release in his capacity as parent because he wanted his child to benefit from participating in cheerleading, as she had done for four previous seasons. He made an important family decision cognizant of the risk of physical injury to his child and the financial risk to the family as a whole. In the circumstance of a voluntary, nonessential activity, we will not disturb this parental judgment. This comports with the fundamental liberty interest of parents in the rearing of their children, and is not inconsistent with the purpose behind our public policy permitting minors to void their contracts.
. . . Our views with respect to the permissibility of requiring releases as a condition of voluntary participation in extracurricular sports activities, and the enforceability of releases signed by parents on behalf of their children for those purposes, are also consistent with and further the public policy of encouraging athletic programs for the Commonwealth’s youth. [Id. at 108-109.][67]
*304 I acknowledge that some out-of-state cases have refused to enforce parental preinjury waivers. See, e.g., Cooper v Aspen Skiing Co, 48 P3d 1229, 1237 (Colo, 2002);[68] Scott v Pacific West Mt Resort, 119 Wash 2d 484; 834 P2d 6 (1992); Hawkins v Peart, 37 P3d 1062 (Utah, 2001); Hojnowski v Vans Skate Park, 375 NJ Super 568; 868 A2d 1087 (2005). However, in my judgment, these decisions rely on the same kind of arguments set forth in the lead opinion and those of Justice HATHAWAY and Chief Justice KELLY and fail to recognize the superior authority of parents, now recognized by the United States Constitution’s Due Process Clause, to make decisions of the present sort on behalf of their children. I find the out-of-state cases allowing parental preinjury waivers of negligence claims far more persuasively reasoned and considerably more in line with the constitutional presumption that parents act in their children’s best interests, as well as with Michigan’s public policy favoring recreational activities and affording some measure of legal protection to providers of such recreational activities.
*305 Finally, it is at least noteworthy that many legal commentators have come down on the side of the enforceability of parental preinjury waivers. Professor Joseph King, Jr., for example, states, “[Negative] judicial attitudes toward exculpatory agreements signed by parents on behalf of their minor children seem inconsistent with the powers conferred on parents respecting other important life choices.” King, Exculpatory agreements for volunteers in youth activities — The alternative to “Nerf®” tiddlywinks, 53 Ohio St L J 683, 716 (1992).[69]
V CONSEQUENCES
As a result of today’s decision holding that parental preinjury waivers are not enforceable, there will be at least the following predictable consequences: (1) this being the first decision in Michigan specifically holding that such waivers are unenforceable, there will be an increase in recreational and sports-related litigation, arising as a consequence both of now invalid past waivers and the disappearance of future waivers, (2) sporting and recreational opportunities, particularly for minors, will dwindle out of a reasonable fear of tort liability,[70] (3) parents’ fundamental interests in making important decisions regarding their children will be *306 curtailed in favor of a rigid judicial policy that prohibits parents from making important decisions concerning their children’s participation in recreational and sporting activities,[71] (4) Michigan’s erstwhile public policy favoring and encouraging recreational and sporting opportunities for minors will run afoul of its new common law diminishing such opportunities, (5) recreational providers, such as schools and municipalities; organizations, such as the YMCA, Boy Scouts, Girl Scouts, and the 4-H Club; civic and service organizations, such as the Optimists, the Kiwanis Club, the Jaycees, the Lions Club, and the Elks; and local small businesses will all be subject to increased exposure to lawsuits and higher insurance costs, which will lead to either a reduction in interest in sponsoring youth activities or an increase in participation costs for minors and their parents, and (6) nonprofit recreational providers will have a more difficult time recruiting volunteers because of their fear of being personally sued if a child is injured.[72]
*307 The rule established here by a majority of justices summarily strikes down tens of thousands of waivers now believed to be valid and enforceable by thousands of providers of recreational and sporting opportunities and the parents of children who partake in such opportunities.[73] One can then be assured, as certainly as day follows night, that every hard slide at third base, every hockey penalty, every overly aggressive tackle, every slip at an ice arena, every broken leg at a summer camp, every display of carelessness by a six year old, and every collision between two young athletes will be followed by the attentions of a lawyer newly specializing in “recreational and sporting law.” That is, if some intrepid providers can still be found who are prepared to continue to make available youth recreational and sporting opportunities.
By contrast, enforcing parental preinjury waivers of negligence claims accords respect to the judgments of parents concerning their minor children’s welfare, upholds the freedom of contract, encourages safe and available recreational and athletic opportunities, and intelligently and responsibly reconciles competing soci *308 etal interests in a fashion similar to that of the Legislature in a widening range of areas pertaining to recreational and sporting opportunities. In refusing to permit parental preinjury waivers, the justices in the majority fail to appreciate the destructive impact of their decision on children, parents, and those who finance and provide recreational opportunities.
The clarifying rule I would adopt is consistent with the common law’s concern that children generally be protected from their own contractual follies, and it is equally faithful to the common law’s concern that parents not act precipitously when releasing an existing negligence claim of their child. This rule is also consistent with the actual practices of the parties themselves in this case, as well as with those of Michigan citizens generally. Indeed, it is contrary to our common-law experience not to bring the common law into accord with the actual customs and practices of its citizens; rather, those customs and practices lie at the foundation of our common law. In my judgment, the rule that would best serve the interests of Michigan citizens, and that most closely comports with our people’s values and traditions, is the rule set forth in this opinion.
VI. RESPONSE TO JUSTICE HATHAWAY’S OPINION
Justice HATHAWAY’s opinion shows particular confusion in its confident and sweeping assertion that “[parental] pre-injury waivers have never been enforced or considered enforceable by the courts of this state.” (Emphasis added.) There is, of course, not the slightest evidence in support of either prong of this assertion. Concerning the first prong, past enforcement, Justice HATHAWAY fails to cite a single judicial decision in this state’s history involving a parental preinjury waiver, and given her agreement with the lead opinion that *309 such waivers are “likely familiar” to parents with young children, one might reasonably wonder why the absence of such judicial decisions supports her conclusion rather than exactly the opposite conclusion. Concerning the second prong, parental preinjury waivers not being “considered enforceable,” there is also not a bit of evidence in support of her position. To the extent that a straightforward and unambiguous waiver is viewed as meaning what it says, there is no reason to suppose that a parent who had signed such a waiver and whose child had been injured in the course of a sporting or recreational activity would even assume that a lawsuit could be brought. While Justice HATHAWAY would apparently tally that parent within the ranks of those who did not “consider enforceable” the waiver, exactly the opposite conclusion is better founded. That is, precisely to the extent that parents shared Justice HATHAWAY’s view and did not view waivers as enforceable, one would logically surmise that lawsuits would be brought and that the absence of such lawsuits should be seen not as Justice HATHAWAY does, as evidence of their unenforceability, but as evidence of the opposite. Justice Hathaway’s premise is necessarily that injured persons reflexively bring lawsuits even when they recognize that they have signed contracts precluding such lawsuits and that their not bringing such lawsuits is the equivalent of their viewing the contract as “unenforceable.” Hers is a seriously faulty premise and, thankfully, does not yet reflect the norms and values of the people of this state, the instant decision by a majority of justices notwithstanding.
VII. CONCLUSION
For all the foregoing reasons, I would affirm in part the judgment of the Court of Appeals to the extent that *310 it held that defendant was not entitled to summary disposition, on the alternative ground that the actual language of the release at issue did not waive the minor’s claims. I would vacate that portion of the Court of Appeals’ judgment concluding that a parent cannot waive a minor child’s negligence claims prospectively, because the release at issue did not actually do so. I dissent, however, from the decision to extend the common-law rule forbidding a parent to release a child’s existing negligence claim to further forbid a parent to prospectively waive such a claim so that his or her child may participate in recreational or sporting activities. The decision by a majority of justices will have significant consequences that will be felt widely throughout this state, including both an increase in litigation and a reduction in sporting and recreational opportunities for children. Thus, if the enforceability of parental preinjury waivers were properly before us, and it is not, I would clarify that Michigan’s common law permits the enforcement of a parental preinjury waiver.
Corrigan, J., concurred with Markman, J.

 See, e.g., Johnson v New River Scenic Whitewater Tours, Inc, 313 F Supp 2d 621 (SD W Va, 2004) (holding that an indemnity agreement with defendant whitewater rafting company was unenforceable and against public policy).

 For the reasons stated in Chief Justice Kelly’s opinion, I would also find it unnecessary to address whether a defendant could circumvent a parental preinjury liability waiver by entering into a separate indemnity agreement with a parent.

 Our caselaw is replete with instances in which waivers signed by-adults have been enforced. See, e.g., Kircos v Goodyear Tire & Rubber Co, 108 Mich App 781; 311 NW2d 139 (1981) (pit crew members could not recover from a sports car club for their injuries because they had signed an applicable waiver); Paterek v 6600 Ltd, 186 Mich App 445; 465 NW2d 342 (1990) (softball field owner’s agreement to let a player play softball on its field was adequate consideration to support the player’s release of *263 the owner from liability); Dombrowski v City of Omer, 199 Mich App 705; 502 NW2d 707 (1993) (release executed by a contestant in a “rope climb” across a river was not subject to rescission on the ground of mutual mistake as a result of the contestant’s signing it without reading it, absent any allegation of misrepresentation); Skotak v Vic Tanny Int’l, Inc, 203 Mich App 616, 617-618; 513 NW2d 428 (1994) (“It is not contrary to this state’s public policy for a party to contract against liability for damages caused by its own ordinary negligence.”); and Lamp v Reynolds, 249 Mich App 591, 594; 645 NW2d 311 (2002) (“[Ajlthough a party may contract against hability for harm caused by his ordinary negligence, a party may not insulate himself against liability for gross negligence or wilful and wanton misconduct.”).

 Const 1963, art 3, § 8, authorizes this Court to issue advisory opinions concerning the constitutionality of legislation, but only upon the request of either house of the Legislature or the Governor and only after it has been enacted into law but not yet taken effect.

 See also MCR 7.316(A)(3), providing that this Court may “permit the reasons or grounds of appeal to be amended.” If ever there was a circumstance compelling the application of this rule, it is here.

 See, e.g., Mack v Detroit, 467 Mich 186, 197; 649 NW2d 47 (2002), in which the defendant “city abandoned its assertion of governmental immunity to this Court,” yet this Court nevertheless held that the city was entitled to prevail because of governmental immunity. As this Court explained:
[A]ddressing a controlling legal issue despite the failure of the parties to properly frame the issue is a well understood judicial principle. See Legal Services Corp v Velazquez, 531 US 533, 549, 558; 121 S Ct 1043; 149 L Ed 2d 63 (2001) (majority and dissent both stating that whether to address an issue not briefed or contested by the parties is left to discretion of the Court); Seattle v McCready, 123 Wash 2d 260, 269; 868 P2d 134 (1994) (indicating that the court “is not constrained by the issues as framed by the parties”). [Id. at 207-208.]

 See Const 1835, Schedule, § 2; Stout v Keyes, 2 Doug 184, 188-189 (Mich, 1845), Const 1850, Schedule, § 1, Const 1908, Schedule, § 1, and Const 1963, art 3, § 7 (“The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by them own limitations, or are changed, amended or repealed”). As noted in Bean v McFarland, 280 Mich 19, 21; 273 NW 332 (1937), “the retention of the common law [in the constitution] is expressly conditioned upon right to abrogate the same or any part thereof.” Thus, whenever the Legislature enacts a statute that is inconsistent with the common law, the statute supersedes the common-law rule. Positive law trumps common law.

 See also Kestin, The bystander’s cause of action for emotional injury; Reflections on the relational eligibility standard, 26 Seton Hall L R 512, 512 (1996) (“Growth in the common law is incremental, often scarcely noticeable in the short run, but inexorable when viewed in the long term.”); Davis v Moore, 772 A2d 204, 238 (DC, 2001) (Ruiz, J., dissenting) (“It cannot be forgotten that the incremental pace at which common law develops, coupled with the increasing importance of statutory law, ensures that cases where truly ‘new’ rules of common law are announced . . . will not frequently occur.”).

 This Court’s authority to alter the common law has also been described as “axiomatic.” North Ottawa Community Hosp v Kieft, 457 Mich 394, 403 n 9; 578 NW2d 267 (1998).

 While this Court’s authority to alter civil common law is unquestioned, our authority to alter criminal common law has been the subject of debate. See, e.g., In re Lamphere, 61 Mich 105, 109; 27 NW 882 (1886) (“Whatever elasticity there may be in civil matters, it is a safe and necessary rule that criminal law should not be tampered with except by legislation.”). Lamphere was cited with approval in People v Riddle, 467 Mich 116, 126; 649 NW2d 30 (2002), yet notwithstanding Lamphere this Court has altered criminal common law on several occasions. See, e.g., People v Stevenson, 416 Mich 383, 392; 331 NW2d 143 (1982) (rejecting the common-law “year and a day” rule and stating that “no limitation upon this Court’s authority to ‘enlarge’ common-law criminal liability appears in Const 1963, art 3, § 7 or can be fairly implied from its language”). In Aaron, 409 Mich at 733, this *270 Court stated, “Today we exercise our role in the development of the common law by abrogating the common-law felony-murder rule.” Further, in People v Kevorkian, 447 Mich 436, 445; 527 NW2d 714 (1994), this Court rejected the common-law definition of “murder” to the extent it could be read to encompass the act of intentionally facilitating the commission of suicide. And in People v Kreiner, 415 Mich 372; 329 NW2d 716 (1982), we essentially held that the Michigan Rules of Evidence constituted a codification of the rules of evidence that superseded common-law rules.

 Although it is undeniably true that this Court’s exercise of the “judicial power” generally involves declaring only what the law “is,” as opposed to what it “ought” to be, Cameron v Auto Club Ins Ass’n, 476 Mich 55, 66; 718 NW2d 784 (2006), citing Marbury v Madison, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803), the quasi-legislative exercise that characterizes our common-law authority is an exception to this general rule. Nonetheless, such common-law authority constitutes a traditional part of the exercise of Michigan’s “judicial power,” just as it does in most states. Ultimately, the “judicial power” of this Court is the sum of the powers that have been conferred upon us by our laws and constitution.

 Notwithstanding this assertion, I note that the author of the lead opinion has also authored and joined opinions in which this Court has altered the common law, as have other members comprising the majority in this case. See, e.g., Ritchie-Gamester v City of Berkley, 461 Mich 73, 89; 597 NW2d 517 (1999); Stitt v Holland Abundant Life Fellowship, 462 Mich 591, 606; 614 NW2d 88 (2000); James v Alberts, 464 Mich 12, 18; 626 NW2d 158 (2001). Moreover, in at least Ritchie-Gamester and James, the common law was not merely being clarified, as it is here, but was clearly being altered. Why is the Legislature the proper institution for addressing the common law in the instant case, but not in those prior cases? The lead opinion provides no standards in this regard, and indeed offers nothing more than the conclusion that the instant matter is better left for the Legislature, even though for more than a century it has been a matter left to the judiciary.

 The lead opinion accurately notes that this Court decides cases and controversies involving individual parties. But it overstates its case when it asserts that we do not give consideration to the views of nonparties. Indeed, justices routinely remind attorneys arguing before this Court that the rule to be formulated by this Court in both common-law and non-common-law cases must he just and reasonable, not only for their individual case, but also for the 100 or 1,000 forthcoming cases that will involve similar legal issues. Moreover, we routinely receive amicus curiae briefs from interested individuals and organizations, just as we have in this case. If the lead opinion’s point is that our common-law decisions require justices to think along somewhat different lines than is required by our other areas of responsibility, I concur. If, however, its point is to suggest the wisdom of retreating from a responsibility that has belonged to Anglo-American courts for 500 years or so, I respectfully disagree. In any event, the lead opinion does reach its conclusions about this case on the basis of its author’s own views of the common law. And further, if this Court did nothing at all to maintain the common law, existing common law would remain in place — at least until the Legislature decided, if ever, to alter it — and it would still have to he interpreted by some court, just as occurred here. It just happens in the instant case that the lead opinion is apparently in agreement with the interpretation of the Court of Appeals.

 See also Gruskin v Fisher, 405 Mich 51, 58; 273 NW2d 893 (1979) (noting that “it is for this Court to decide whether a common-law rule shall be retained unless the Legislature states a rule that is inconsistent with or precludes a change in the common-law rule”).

 This Court, in lieu of the Legislature, has altered the common law over the last 40 years on numerous occasions. See, e.g., Daley v LaCroix, 384 Mich 4, 12-13; 179 NW2d 390 (1970) (rejecting the “impact” requirement for common-law claims for emotional distress proximately caused by a defendant’s negligent conduct); Womack v Buchhorn, 384 Mich 718, 724-725; 187 NW2d 218 (1971) (rejecting the common-law disallowance of recovery for negligently inflicted prenatal injury); Plumley v Klein, 388 Mich 1; 199 NW2d 169 (1972) (abolishing the common-law rule that children cannot bring a tort cause of action against their parents); Pittman v Taylor, 398 Mich 41; 247 NW2d 512 (1976) (abrogating the common-law doctrine of state governmental immunity); Serafin v Serafin, 401 Mich 629; 258 NW2d 461 (1977) (abolishing Lord Mansfield’s rule, which prevented spouses from testifying that they had no access to each other at the time a child was conceived to prove the husband’s lack of paternity); Gruskin, 405 Mich at 58, 70-71 (rejecting the common-law rule that forfeiture of a land contract is considered an election of remedy); Placek, 405 Mich at 656-657 (abolishing common-law contributory negligence as a total bar to recovery and adopting pure comparative negligence); Toussaint v Blue Cross & Blue Shield of Mich, 408 Mich 579, 615; 292 NW2d 880 (1980) (making employer policies and procedures a legally enforceable part of an employment relationship if such policies and procedures instill “legitimate expectations” of job *273 security); Aaron, 409 Mich at 723 (abolishing the common-law felony-murder rule); Berger v Weber, 411 Mich 1; 303 NW2d 424 (1981) (expanding the common law to permit a child to recover money damages for the lost society and companionship of a negligently injured parent, notwithstanding the argument that the Legislature was in the best position to determine whether this new cause of action should be instituted and what limits should be placed on it); Kreiner, 415 Mich at 377 (holding that Michigan’s common-law tender-years rule, which permitted excusable delay in reporting certain crimes against minors, did not survive the adoption of MRE 803[2]); Stevenson, 416 Mich at 392 (abolishing the common-law year-and-a-day rule in homicide cases); Kevorkian, 447 Mich at 494 (rejecting the common-law definition of “murder” to the extent it could be read to encompass intentionally providing the means by which a person commits suicide); Bertrand v Alan Ford, Inc, 449 Mich 606; 537 NW2d 185 (1995) (applying the common-law open-and-obvious-danger doctrine to claims of premises liability); Ritchie-Gamester, 461 Mich at 89 (specifically modifying the common law of torts regarding recreational activities by adopting reckless misconduct as the minimum standard of care for co-participants in recreational activities); Stitt, 462 Mich at 606 (holding, as a matter of premises liability law, that church visitors are not invitees); and James, 464 Mich at 18 (abolishing the common-law “volunteer” doctrine); see also Ghaffari v Turner Constr Co, 473 Mich 16, 25-26; 699 NW2d 687 (2005) (clarifying that the open-and-obvious-danger doctrine has no applicability to a claim under the common-work-area doctrine). And, concomitantly, there have been occasions on which this Court has rejected requests to alter the common law. See, e.g., In re Certified Question, 479 Mich 498, 521-522; 740 NW2d 206 (2007) (declining to expand the common law to impose a duty on a landowner to anybody who comes into contact with somebody who has been on the landowner’s property because it would expand traditional tort concepts beyond manageable bounds); Wold Architects & Engineers v Strat, 474 Mich 223, 236; 713 NW2d 750 (2006) (declining to reject Michigan’s common-law arbitration-unilateral-revocation rule, being “unpersuaded that the time is ripe to change” the rule); Henry, 473 Mich at 68, 89 (“[although . . . recognizfing] that the common law is an instrument that may change as times and circumstances require,” declining to expand the common law to recognize a medical monitoring cause of action, noting that it might “lead to dramatic reallocation of societal benefits and burdens”).

 As this Court emphasized in Terrien v Zwit, 467 Mich 56, 67; 648 NW2d 602 (2002): “The public policy of Michigan is not merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law.” The focus of *275 the judiciary must ultimately be on the policies that, in fact, have been adopted by the public through our various legal processes and that are reflected in our state and federal constitutions, our statutes, the common law, and administrative rules and regulations. Id. at 71 n 11.

 “[Ljegislative amendment of the common law is not lightly presumed.” Wold Architects, 474 Mich at 233. Rather, the Legislature “should speak in no uncertain terms” when it exercises its authority to modify the common law. Hoerstman Gen Contracting, Inc v Hahn, 474 Mich 66, 74; 711 NW2d 340 (2006). See also Burns, 367 Mich at 492 n 5, in which we approvingly quoted Judge Benjamin N. Cardozo:
“When the legislature has spoken, and declared one interest superior to another, the judge must subordinate his personal or subjective estimate of value to the estimate thus declared. He may not nullify or pervert a statute because convinced that an erroneous axiology [set of values] is reflected in its terms.” [Citation omitted.]
I note further that the Legislature has forbidden prospective waivers of certain rights. For example, the Worker’s Disability Compensation Act states: “No [preinjury] agreement by an employee to waive his rights to compensation under this act shall be valid... .” MCL 418.815. The Michigan Employment Security Act states: “No agreement by an individual to wave [sic], release, or commute his rights to benefits or any other rights under this act from an employer shall be valid.” MCL 421.31. And the teacher tenure act provides: “No teacher may waive any rights and privileges under this act in any contract or agreement made with a controlling board.” MCL 38.172. Here, however, the Legislature has in no way forbidden releases in which a parent prospectively waives a child’s negligence claims.

 See, e.g., Jackson v PKM Corp, 430 Mich 262, 278; 422 NW2d 657 (1988) (“The Legislature intended the dramshop act to afford the exclusive remedy for injuries arising out of an unlawful sale, giving away, or furnishing of intoxicants thereby preempting all common-law actions arising out of these circumstances.”); Hoerstman Gen Contracting, 474 Mich at 74 (“... Article 3 of the [Uniform Commercial Code] is comprehensive. It is intended to apply to nearly every situation involving negotiable instruments.”).

 Concerning the common law, Oliver Wendell Holmes, Jr., stated that it is predicated, not upon logic, but upon experience. Holmes, The Common Law, p 1.

 Judge Cardozo, in his William L. Storrs Lectures before the Yale University Law School in 1921, had this to say:
There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. [Cardozo, The Nature of the Judicial Process (New Haven: Yale University Press, 1921), p 151.]
In the case at bar, there is no hint that either party operated as if the common-law rule adopted here by a majority of justices (that a parent may not waive his or her child’s negligence claim prospectively in order to participate in a sporting or recreational activity) determined their conduct. Indeed, the precise opposite is true: a waiver purporting to have exactly the opposite effect was signed.

 As stated in Stitt, 462 Mich at 607 “[I]n exercising our common-law authority, our role is not simply to ‘count heads’ but to determine which common-law rules best serve the interests of Michigan citizens.” The lead opinion asks whether a parental preinjury waiver is “ever” in the best interests of a child who becomes injured. Ante at 251-252. However, the proper question would take into consideration the interests of all children whose parents sign a preinjury waiver, as well as the interests of all children whose access to sporting or recreational activities might be adversely affected by rule the majority favors, not merely those very few children whose parents have signed a preinjury waiver and who later suffer an injury. If we could look into the future and know which children will, in fact, be injured after a preinjury waiver has been signed, we would, of course, have to conclude that it would have been better if it had not been signed. The lead opinion’s is a misleading and skewed question. As we stated in Stitt, our inquiry should be what rule best serves Michigan’s citizens in general.

 Justice Hathaway’s opinion states, “[T]he fact is that preinjury waivers have never been enforced or considered enforceable by the courts of this state.” Ante at 258. But also like the lead opinion, she does not cite a single Michigan case in which a preinjury waiver of a child’s negligence claim has been deemed unenforceable. Obviously, neither of the parties in the instant case was similarly apprised that preinjury waivers have never *279 been enforced or considered enforceable. Nor were the countless numbers of sporting and recreational providers and the parents of children participating in sporting and recreational activities who have signed preinjury waivers over the decades. Nor, for that matter, was the trial court judge or two judges of the Court of Appeals.

 Publishers Agency, Inc v Brooks, 14 Mich App 634; 166 NW2d 26 (1968) (recognizing that minors are hable for contracts to purchase necessaries).

 The Age of Majority Act, MCL 722.51 et seq., effective January 1,1972. Under MCL 722.52(1), a person who attains the age of 18 “is an adult of legal age for all purposes whatsoever, and shall have the same duties, liabilities, responsibilities, rights, and legal capacity as persons heretofore acquired at 21 years of age.” But one still must be 21 in order to lawfully purchase or consume alcoholic beverages under an amendment of our constitution that was adopted in 1978. Const 1963, art 4, § 40; see MCL 722.52(1).

 MCL 712A.2(a)(l) provides that the family division of circuit court has “[ejxclusive original jurisdiction superior to and regardless of the jurisdiction of another court” in proceedings concerning minors under the age of 17 who violated a municipal ordinance or a state or federal law. Indeed, the common law’s solicitude toward minors has heen diminished dramatically with respect to criminal law. Pursuant to MCL 769.1(1), a court must sentence a juvenile convicted of any one of 12 specified serious felonies in the same manner as an adult. See also MCR 6.931(A). In 1996, the Michigan Legislature amended the state’s juvenile code, allowing a child of any age to be tried and sentenced in the family division of circuit court in the same manner as an adult. This procedure may take place either at the discretion of the prosecutor for certain “specified juvenile violations,” MCL 712A.2d(l), or by order of the court following a request by the prosecutor and a hearing for any other offense, MCL 712A.2d(2). In 1997, an 11 year old was charged by the prosecutor as an adult, pursuant to tins statute, with first-degree premeditated murder, assault with intent to murder, and two counts of felony-firearm. See People v Abraham, 234 Mich App 640; 599 NW2d 736 (1999); People v Abraham, 256 Mich App 265; 662 NW2d 836 (2003). Indeed, we are told that the Michigan Department of Corrections currently holds 146 defendants sentenced to life without the possibility of parole who were 16 or younger when they committed their offenses. Note: A second chance: Michigan’s progressive shift in social policy to rehabilitate its mentally ill and juvenile defendants, 86 U Det Mercy L R 559, 565 (2009).

 The lead opinion cites MCL 600.1404(2) (educational loans) as an exception, hut this 1970 statute is no longer properly considered an exception because it refers to the enforceability of educational loans entered into by “a minor 18 or more years of age ....” When the statute was enacted, the age of majority was 21. Because the age of majority is now 18, the statute is little more than an anachronism.

 MCL 722.4e(l)(a) states:
A minor shall be considered emancipated for the purposes of, but not limited to, all of the following:
(a) The right to enter into enforceable contracts, including apartment leases.

 MCL 722.4(2)(a). A minor who is 16 or 17 can marry with the consent of a parent. MCL 551.103(1).

 MCL 722.4(2)(c). Under federal law, a 17 year old can join the military with the consent of a parent. See 10 USC 505(a).

 MCL 491.614 authorizes the issuance of a savings account to a minor as the sole and absolute owner of the account and authorizes the paying of withdrawals and the performance of acts with respect to the account on the order of the minor with the same effect as if the minor had full legal capacity.

 MCL 333.6121(1) provides that a minor who is or professes to be a substance abuser may sign a consent to the provision of substance-abuse-related medical or surgical care, treatment, or services by a hospital, clinic, or health professional and that the consent is valid and binding in the same manner as if the minor had achieved the age of majority.

 MCL 333.5127(1) provides that a minor who is or professes to be infected with a venereal disease or HIV may sign a consent to the provision of medical or surgical care, treatment, or services by a hospital, clinic, or physician and that the consent is valid and binding in the same manner as if the minor had achieved the age of majority.

 MCL 333.9132 provides that a minor may sign a consent to the provision of prenatal and pregnancy-related health care or to the provision of health care for a child of the minor by a licensed health facility or agency or a licensed health professional and that the consent is valid and binding in the same manner as if the minor had achieved the age of majority.

 MCL 330.1707 provides:
A minor 14 years of age or older may request and receive mental health services and a mental health professional may provide mental health services, on an outpatient basis, excluding pregnancy termination referred services and the use of psychotropic drugs, without the consent or knowledge of the minor’s parent, guardian, or person in loco parentis.

 MCL 500.2205 provides that a life insurance or disability insurance contract made by a person between the ages of 16 and 18 years for the person’s benefit or that of a close relative is good and of the same force and effect as though the minor had attained majority at the time of making the contract.

 See also Llapa-Sinchi v Mukasey, 520 F3d 897, 900 (CA 8, 2008), which explains:
Minors can be responsible for their own legal status and can waive their constitutional rights. Courts have repeatedly held this, and statutes have long allowed it. The Supreme Court has held *285 minors can be responsible for waiving their right to appeal deportation and custody determinations.
Llapa-Sinchi went on to cite cases holding that minors can waive the right to appeal, the right to a jury trial, and the rights guaranteed by Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

 "It is the natural, fundamental right of parents and legal guardians to determine and direct the care, teaching, and education of their children.” MCL 380.10 (part of the Revised School Code).

 MCL 722.903(1).

 MCL 710.43(4).

 MCL 333.13102(1).

 MCL 711.1(5).

 MCL 436.1701(7).

 MCL 551.103(1).

 MCL 700.5105.

 MCL 330.1717(l)(b).

 MCL 257.310e(3)(c).

 MCL 409.103(2)(a) and (b).

 MCL 700.5103(1).

 MCL 750.137.

 MCL 750.327a.

 MCL 750.421c.

 10 USC 505(a).

 45 CFR 46.404 through 46.408.

 The lead opinion correctly notes, ante at 256-257, that the common law generally holds minors to a lower standard than an adult. But it fails to mention that even infants were liable for their torts at common law. Indeed, in Jennings v Rundall, 101 Eng Rep 1419, 1421-1422 (KB, 1799), Lord Kenyon said, “[I]f an infant commit an assault, or utter slander, God forbid that he should not be answerable for it in a Court of Justice.” See also Prosser, Torts (3d ed), § 128, p 1024. Moreover, our common law provides that “ ‘whenever a child, whether as plaintiff or as defendant, engages in an activity which is normally one for adults only * * * he must be held to the adult standard, without any allowance for his age.’ ” Farm Bureau Ins Group v Phillips, 116 Mich App 544, 547; 323 NW2d 477 (1982), quoting Prosser, Torts (4th ed), § 32, pp 156-157; accord Constantino v Wolverine Ins Co, 407 Mich 896 (1979); Osner v Boughner, 180 Mich App 248, 254-257; 446 NW2d 873 (1989) (driving is an adult activity, and when minors drive, they are held to the adult standard of care).

 Under the clarifying rule I would adopt, parents would still need judicial approval to settle existing claims involving their children, and even prospective waivers would be ineffective with respect to claims of gross negligence or willful or wanton behavior. Lamp, 249 Mich App at 594 (“[A] party may not insulate himself against liability for gross negligence or wilful and wanton misconduct.”). I also would not allow prospective waivers regarding compulsory activities, such as required school classes or events. See, e.g., Sharon v City of Newton, 437 Mass 99, 106; 769 NE2d 738 (2002) (enforcing a release “in the context of a compelled activity. . . might well offend public policy”).

 MCL 324.73301(1) provides:
Except as otherwise provided in this section, a cause of action shall not arise for injuries to a person who is on the land of another without paying to the owner, tenant, or lessee of the land a valuable consideration for the purpose of fishing, hunting, trapping, camping, hiking, sightseeing, motorcycling, snowmobiling, or any other outdoor recreational use or trail use, with or without permission, against the owner, tenant, or lessee of the land unless the injuries were caused by the gross negligence or willful and wanton misconduct of the owner, tenant, or lessee.

 MCL 408.342(2) provides:
Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary. Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees, and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment.

 MCL 445.1725 provides “Bach person who participates in roller skating accepts the danger that inheres in that activity insofar as the dangers are obvious and necessary.”

 MCL 691.1663 provides:
Except as otherwise provided in [MCL 691.1665], an equine activity sponsor, an equine professional, or another person is not liable for an injury to or the death of a participant or property damage resulting from an inherent risk of an equine activity. Except as otherwise provided in [MCL 691.1665], a participant or participant’s representative shall not make a claim for, or recover, civil damages from an equine activity sponsor, an equine professional, or another person for injury to or the death of the participant or property damage resulting from an inherent risk of an equine activity.

 The Court of Appeals stated:
[W]e hold that a baseball stadium owner that provides screening behind home plate sufficient to meet ordinary demand for protected seating has fulfilled its duty with respect to screening and cannot be subjected to liability for injuries resulting to a spectator by an object leaving the playing field. [Benejam, 246 Mich App at 657-658.]

 I do recognize that some contracts are not enforceable in Michigan as a matter of public policy. See, e.g., Cudnik v William Beaumont Hosp, 207 Mich App 378, 389-390; 525 NW2d 891 (1994), which held that on the *294 basis of public policy, “an exculpatory agreement executed by a patient before treatment is not enforceable to absolve a medical care provider from liability for medical malpractice and other acts of negligence related to a patient’s medical care.”

 I certainly agree that a third party cannot bind someone else to a contract. That is, if a parent signs a contract purporting to bind his next door neighbor or the neighbor’s child, that contract would obviously be of no effect.

 In 1982 Chief Justice Warren Burger observed:
One reason our courts have become overburdened is that Americans are increasingly turning to the courts for relief from a range of personal distresses and anxieties. Remedies for personal wrongs that once were considered the responsibilities of institutions other than the courts are now boldly asserted as “legal entitlements.” The courts have been expected to fill the void created by the decline of church, family, and neighborhood unity. [Burger, Isn’t there a better way?, 68 ABA J 274 (1982).]
See also Posner, The Federal Courts: Crisis And Reform 55-79 (1985) (explicitly finding a litigation explosion since the 1960’s and employing numerous categories of statistics to analyze this dramatic increase), and Olson, The Litigation Explosion: What Happened When America Unleashed the Lawsuit (1991).

 See also Bator, What is wrong with the supreme court?, 51U Pitt L R 673, 676-677 (1990):
In the 1985 fiscal year there were filed in the federal district courts about 315,000 civil and criminal cases; this is, of course, exclusive of the some 365,000 bankruptcy petitions filed in 1985. (Compare this figure of 315,000 to the total of under 200,000 cases commenced as recently as 1980 and the total of some 120,000 commenced in 1970.) In 1985, these district court cases, together with the work of those administrative agencies reviewed directly in the courts of appeals, generated, in 1985, a total of about 34,000 new cases in the federal courts of appeals (including the Court of Appeals for the Federal Circuit). (This figure of 34,000 should be contrasted with the figure of just over 23,000 such cases in 1980, 11,500 in 1970, and under 4,000 in I960.).

 As stated by the Ohio Supreme Court in Zivich v Mentor Soccer Club, Inc, 82 Ohio St 3d 367, 372; 696 NE2d 201 (1998): “[Fjaced with the very real threat of a lawsuit, and the potential for substantial damage awards, nonprofit organizations and their volunteers could very well decide that the risks are not worth the effort.”

 In 1996 New York City Parks Commissioner Henry Stern stated, “In today’s litigious world, the children come to the playground with parents and the parents come with lawyers.” Douglas, That Upside-Down High Will Be Only a Memory, Monkey Bars Fall to Safety Pressure, NY Times, April 11, 1996, available at (accessed June 10, 2010). Indeed, it was widely reported last year that a child in the New York area sued two coaches along with Little League Baseball Incorporated and the New Springville Little League when he was injured sliding into second base. Nyback, Staten Island mom settles suit with Little League and coaches over knew injury, available at <http://www.silive.com/northshore/ index.ssf/2009/08/staten_island_mom_settles_suit.html> (accessed June 10, 2010); see also Benard, Little league fun, big league liability, 8 Marq Sports L J 93, 98 (1993) (“[Ojur lawsuit happy society has come to view a child’s misjudging a fly ball as a cause of action against an individual who may, incidentally, have the most economic wealth.”); Doughtery, This Museum Exposes Kids To Thrills, Chills and Trial Lawyers, Wall St J, M!ay 1, 2010 (reporting that annual insurance costs for the City *300 Museum in St. Louis Missouri, have risen from about $36,000 since its founding in 1997 to about $600,000 a year, representing about $1 of the museum’s $12 admission price), available at (accessed June 10, 2010).

 However, I well recognize that “in exercising our common-law authority, [this Court’s] role is not simply to ‘count heads’ but to determine which common-law rules best serve the interests of Michigan citizens.” Stitt, 462 Mich at 607.

 Hohe stated:
Hohe, like thousands of children participating in recreational activities sponsored by groups of volunteers and parents, was asked to give up her right to sue. The public as a whole receives the benefit of such waivers so that groups such as Boy and Girl Scouts, Little League, and parent-teacher associations are able to continue without the risks and sometimes overwhelming costs of litigation. Thousands of children benefit from the availability of recreational and sports activities. Those options are steadily decreasing— victims of decreasing financial and tax support for other than the bare essentials of an education. Every learning experience involves risk. In this instance Hohe agreed to shoulder the risk. No public policy forbids the shifting of that burden. [Hohe, 224 Cal App 3d at 1564.]

 See also Brooks v Timberline Tours Inc, 941 F Supp 959 (D Colo, 1996) (upholding the enforceability of waivers signed by parents on behalf of their minor child); Kondrad v Bismarck Park Dist, 655 NW2d 411 (ND, 2003) (child’s negligence claim was barred by a waiver and release signed by his mother regarding an after-school care program when the minor fell on the school grounds while riding a bicycle owned by a child who was not part of the after-school care); Gonzalez v City of Coral Gables, 871 So 2d 1067 (Fla App, 2004) (upholding a parental preinjury release executed for a minor’s participation in a high school fire-rescue *304 training program); Rackley v Advanced Cycling Concepts Inc, 2009 Tex App LEXIS 1888 (2009) (barring the claim of a child injured at a “Pump it Up” party — a chain of children’s party venues featuring inflatable houses, slides, and obstacle courses — because of a release signed by his parent); Mohney v USA Hockey, Inc, 77 F Supp 2d 859 (ED Ohio, 1999) (applying the Zivich holding and ruling that “[njothing in the Zivich opinion indicates that its holding should be limited to nonprofit sports organizations that are local in scope”), aff d in part and rev’d in part on other grounds, 248 F3d 1150 (CA 6, 2001) (stating that parents have the authority to bind their minor children to exculpatory agreements).

 The Cooper case, however, was legislatively superseded by statute in 2003. As noted in Pollock v Highlands Ranch Community Ass’n, Inc, 140 P3d 351 (Colo App, 2006), the statute recognizes a substantive defense to negligence claims that will often operate as a complete bar to relief. The statute provides: “A parent of a child may, on behalf of the child, release or waive the child’s prospective claim for negligence.” Colo Rev Stat 13-22-107(3). An Alaska statute similarly allows a parent to prospectively waive a child’s negligence claim. Alas Stat 09.65.292.

 See also Comment, Interscholastic sports: Why exculpatory agreements signed by parents should be upheld, 76 Temp L R 619 (2003); Comment, The theory of the waiver scale: An argument why parents should be able to waive their children’s tort liability claims, 36 USF L R 535 (2002); Note, Scott v Pacific West Mountain Resort: Erroneously invalidating parental releases of a minor’s future claim, 68 Wash L R 457 (1993).

 As was recognized in Nat’l Int’l Brotherhood of Street Racers, Inc v Superior Court, 215 Cal App 3d 934, 937; 264 Cal Rptr 44 (1989), “many-popular and lawful recreational activities are destined for extinction” unless preinjury waivers are enforceable.

 I concur with the following dissenting statement in Hojnowski, 375 NJ Super 568 at 598 (Fisher, J. concurring in part and dissenting in part):
I believe a parent also has the right — with which the state must not interfere — to decide whether a child may play football or collect sea shells, learn to ride a horse or engage in bird-watching, go skateboarding or only play video games involving animated skateboarders, or engage in any other type of sport or recreational activity that encompasses inherent risks, or those that are sedate, or all such activities, or none. The majority may not view these matters as important, but, important or not, they and countless others ought to be resolved solely within the sphere of the family and, absent the parents’ unfitness, it should be beyond our courts’ power to say otherwise.

 The lead opinion asserts, remarkably, that if the rule the majority here favors were not adopted, business owners might have a diminished incentive to maintain their property appropriately, resulting in an increased number of injuries to children. Ante at 249. I see just the opposite incentive. This concern is considerably overblown, in my judg *307 ment. First, providers would continue to be liable when they acted in a grossly negligent manner. Second, recreational providers of sports and recreational activities to adults already have waivers enforced absent gross negligence, and there is utterly no evidence that those facilities are generally maintained in an unsafe manner. Third, as noted by the Ohio Supreme Court, “enforcement of [parental waivers] may well promote more active involvement by participants and their families, which, in turn, promotes the overall quality and safety of these activities. [Zivich, 82 Ohio St 3d at 372.]

 Regrettably, many of the providers who continue to abide by established customs and practices, and who may only belatedly become aware of today’s decision, will learn the hard way that contracts they believed were protecting them and their businesses have become unenforceable. This is all the more reason why the common law ought to closely reflect the actual customs and practices of the people, so that citizens need not enroll in continuing legal education courses.